IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 1, 2022

## IN RE RUFUS C.

**Appeal from the Juvenile Court for Wilson County**
**No. 2020-JT-9      Charles B. Tatum, Judge**

_____

### No. M2021-01538-COA-R3-PT

_____

This appeal concerns the termination of a mother's parental rights to her child.  The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Wilson County ("the Juvenile Court") seeking to terminate the parental rights of Christina C. ("Mother") to her minor child Rufus C. ("the Child").  After a hearing, the Juvenile Court entered an order terminating Mother's parental rights.  Mother appeals.  We find, as did the Juvenile Court, that the grounds of severe child abuse and persistent conditions were proven against Mother by clear and convincing evidence.  However, due to ambiguity in the Juvenile Court's order, we vacate the ground of abandonment by failure to provide a suitable home.  We further find, also by clear and convincing evidence, that termination of Mother's parental rights is in the Child's best interest.  We affirm the Juvenile Court's judgment, as modified, terminating Mother's parental rights to the Child.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Affirmed as Modified; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY W. ARMSTRONG, JJ., joined.

James Patterson, Lebanon, Tennessee, for the appellant, Christina C.

Herbert H. Slatery, III, Attorney General and Reporter; and Erica M. Haber, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## Background

The Child was born to Mother and her then-husband, R.C. ("Father"), in January of 2012.[1] Mother and Father lived in Alabama. They had a tumultuous relationship, and divorced in 2014. Mother and Father continued to live with one another after their divorce. Mother later left Father and moved in with Justin C., whom she eventually married. Mother took the Child from Father and moved to Hopkinsville, Kentucky. Soon thereafter, Mother and the Child moved to Tennessee. Mother did not enroll the Child in school in either Kentucky or Tennessee. By 2020, Mother was romantically involved with Michael B. Both Mother and Michael B. already were married.

In October 2019, DCS received a referral alleging lack of supervision, drug-exposed child, educational neglect, and sexual abuse. Mother was living in a hotel at the time. Mother tested positive for THC, amphetamines, and methamphetamine. DCS filed a dependency and neglect petition. After a preliminary hearing, the Juvenile Court found the Child dependent and neglected. The Child entered DCS custody on October 29, 2019. He was placed in the home of Mr. B. ("Foster Father") and Ms. B. ("Foster Mother") ("Foster Parents," collectively). In December 2019, a permanency plan for Mother was ratified. Mother's responsibilities under the plan required her to, among other things, seek treatment for drug abuse and secure suitable housing. Subsequent revisions of the plan largely kept the same responsibilities, although a secondary goal of adoption was added. In June 2020, DCS filed a supplemental dependency and neglect petition to allege severe child abuse based upon the Child having tested positive for methamphetamine in December 2019.

On November 3, 2020, DCS filed a petition in the Juvenile Court seeking to terminate Mother's parental rights to the Child. DCS alleged against Mother the grounds of abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plans, persistent conditions, severe child abuse, and failure to manifest an ability and willingness to assume custody. DCS also alleged that termination of Mother's parental rights would be in the Child's best interest. This case was tried in October and December of 2021. We proceed to review the pertinent testimony from trial.

Christa Hodge ("Hodge"), a foster care worker with DCS, testified. Hodge was assigned to the Child's case. When the Child entered DCS custody on October 29, 2019, Mother was living in a hotel with her husband, Justin C. Mother then began a series of moves. She lived in a tent "in the woods" for a while. Mother eventually separated from

---

[1] Father did not appeal the termination of his parental rights. We relate facts concerning Father only to the extent necessary to set out the background of Mother's case.

Justin C. due to domestic violence. In January 2020, she went to live with a friend. Hodge stated: "I did explain to [Mother] that that could be a -- well, obviously, if it was stable enough and if that was a long-term home for her, that we could work towards the child coming there, but she did not reside there long enough for us to even more forward with that." Mother's residence lacked a heating or cooling system. Hodge helped Mother by providing her with heaters. By March 2020, Mother was romantically involved with Michael B. According to Hodge, Mother lacked suitable housing during this period. Hodge testified:

> Q. (By [DCS attorney] Mr. Cochran) Now, during that period of time, the initial four-month window after [the Child] came into custody, do you recall -- I mean, obviously, we were -- we created the permanency plan. Do you recall doing anything specific or having any specific conversations with the mother about housing?
> A. Can I -- can you rephrase that question?
> Q. Yeah. So in addition to sort of just having CFTMs, you know, discussing the case generally, do you remember -- and if the answer is no, that's fine --
> A. Uh-huh.
> Q. -- but do you recall if there were any specific conversations or specific emphasis on housing -- on her housing?
> A. No.
> Q. Okay. Did she ever ask for any assistance with housing?
> A. She did not.
> Q. Now, you did mention earlier at some point, though, you helped her with some heating?
> A. Yes, the -- with the family friend [R.] in Centerville, Tennessee.
> Q. Okay. Is that something you just knew to do, or did you-all have a conversation about it?
> A. She had asked me, that they needed some type of heating system, and I was able to reach out to our resource linkage and get those. I got her a couple of heaters that I was able to bring to her.
> Q. And when you say you got her some, is that something that we got through, sort of, a charity, or did the Department pay for those, or do you recall?
> A. I think it was with the -- some outside resources that the resource linkage was able to -- like a church or something that was able to provide them to us.
> Q. Okay. But you yourself was -- you were involved in securing that?
> A. Yes.

Hodge then testified to Mother's drug screens. Mother last tested positive for methamphetamine in January 2020. Mother's drug screens through June of 2021, however,

all came back negative for methamphetamine. In December 2019, Mother completed a specialized assessment through Health Connect America. This assessment focused on parenting as well as alcohol and drugs. It also had a clinical component. Mother completed certain of the therapy. However, Hodge stated that Mother had not completed the recommended intensive outpatient program. With respect to whether Mother had a job, Hodge testified that Mother never provided her with a W-2, a pay stub, or a schedule from an employer. Mother instead gave Hodge a piece of paper the day before trial stating that Mother was working for a family, cleaning and doing various tasks. As of trial, Mother resided with Michael B. in a home he rented. Mother was on the lease, as well. Hodge had visited this home. It was a two-bedroom home with one bath. Mother, Michael B., and four of Michael B.'s children lived in the home. Hodge described the home:

> There was some broken -- there was a broken window when I entered -- when I entered into, like, the driveway area. There is no central … air within the home. They do have -- they had two little, like, AC units, one in the main room and one in the living room, but it did not cool the entire house. When you step into the kitchen, it was significantly warm. I actually had to ask [Mother] for me to, like, step outside just because I was profusively [sic] sweating just standing in there with [Mother]. The home had electricity but there was no central … air.

Mother told Hodge that it was "very expensive" to fix the heating and cooling system. With regard to the Child's diagnoses, Hodge stated that he has an intellectual disability "along with the autism spectrum." Hodge stated that the Child's needs are being met by Foster Parents. Foster Mother is a school bus driver. Foster Father is a special needs teacher. Hodge testified that, to her knowledge, Mother never utilized any resources to assist in understanding how to deal with the Child's special needs. However, Mother did regularly visit the Child. Also, Mother had obtained a valid Tennessee driver's license. Hodge testified that, in all, Mother lived in six different locations over the course of the custodial episode.

Regarding persistent conditions, Hodge stated that the original conditions causing the Child's removal were "[d]rug exposure, lack of supervision, educational neglect, and the possibility of sexual abuse." Hodge testified that drug exposure did not appear to be an issue for Mother as of trial. At this point, DCS attempted to enter into evidence a hair follicle test result document showing that the Child tested positive for methamphetamine in December 2019. Mother's counsel objected, but the evidence was entered over the objection. Hodge testified that the Child tested positive for methamphetamine in December 2019. Asked what concerns she had about the Child being placed with Mother, Hodge stated: "My concern is that [Mother] continues to show instability that brought the concerns to the Department of Children's Services on October 29, 2019, and that those could not be

fixed of some sort in order for [the Child's] health, well-being, so forth, and long term." Hodge testified that on one occasion, DCS had to approach the court because Mother would not allow the Child's hair to be cut even though the Child himself wanted his hair cut. DCS also had to approach the court when Mother refused to allow the Child to be sedated so that he could undergo a tonsillectomy. DCS had to approach the court once more when Mother refused to cooperate with putting the Child on psychotropic medication. In each instance, the court allowed DCS to proceed. Concerning child support, Mother had been ordered to pay $20 per week. Hodge stated that Mother made some payments. However, Hodge had not seen proof of any new child support payments from Mother since May 2021. With respect to the Child's life with his foster family, Hodge stated that the Child's interactions with Foster Parents are "very positive." She further stated that Foster Parents attend to the Child's medical appointments and educational needs.

On cross-examination, Mother's counsel showed Hodge a document purporting to be a certificate of achievement for Mother's completion of an intensive outpatient program in June 2020. Hodge testified that she had not seen the document before. Hodge was then asked about DCS's efforts to help Mother obtain suitable housing:

> Q. (By [Mother's attorney] Mr. Patterson) So coming straight to the point: You knew she was living in a tent [at the beginning of the custodial episode]. Why didn't you help her try to get any sort of housing?
> A. At that point, [Mother] had -- was not -- that was -- didn't appear to be her priority at -- at that point in time, and so I wasn't able to initiate or assist in any way of some sort.
> Q. DCS's goal at that point was still to reunite the child into the home -- or child and parent. So DCS decided or yourself decided -- I don't want to put words in your mouth -- that you were not going to help get her into a home in any way, form, or fashion?
> A. No, sir.

Asked whether the Child cares for Mother, Hodge replied that he loves her. However, Hodge elaborated: "I don't believe it would be the end of the world if [the Child] did not see [Mother] anymore. He is very bonded to [Foster Parents], and I've witnessed that firsthand. He does call [Mother] 'Mom,' but he also calls [Foster Parents] 'Mommy and Daddy.' They're Mommy and Daddy, and she's Mom, so …."

Foster Mother testified, as well. Foster Parents had fostered fourteen children. They also have two biological children, ages 19 and 17 as of the day of trial. Foster Mother had never adopted a child, however. Foster Mother testified that she and Foster Father were considering adopting the Child. When the Child first arrived in Foster Parents' home, his speech was "very broken and difficult." The Child did not know any numbers or letters.

-5-

He was also "pretty wild." The Child told Foster Mother, unprompted, that Mother and Justin C. had smoked "dope." Foster Parents initially enrolled the Child into mainstream classes at a public school, but that did not work out. The Child was then enrolled at a different school in a class for children with special needs. Foster Mother testified that the Child "loves school." She further stated that the Child is now speaking in full sentences. Meanwhile, Mother has engaged in therapeutic visitation with the Child. Foster Mother stated that Mother made practically all of her scheduled visits. The Child had acted belligerently after visiting with Mother in the past, but this had improved.

Foster Mother stated that if Mother's parental rights were terminated, she would nevertheless allow Mother to have some limited contact with him as "he clearly has an attachment with her, and I feel like it would be detrimental for him to sever that attachment. I don't feel like that would be in his best interest." Foster Mother testified that she could not deny that Mother had "matured" over the course of the custodial episode. Foster Mother stated that she and Foster Father would like to continue to have the Child in their home. On cross-examination, Foster Mother stated that Mother claimed the Child had a brain tumor, but that a neurosurgeon at Vanderbilt explained to her that it was simply a mislocated mass of fat on top of the Child's head and was no cause for concern. Foster Mother also testified that, when she first started taking care of the Child, a company called Labcorp came to her house and performed a hair follicle drug test on the Child. The Child tested positive for methamphetamine.

Mother testified. Asked why she failed to enroll the Child in school in Tennessee or Kentucky, Mother stated that she was "scared" Father would come and take the Child from her as he had done once before. From March through late October 2019, the Child received no formal education. Mother testified: "I was just doing it through homeschool -- well, I was doing, kind of, homeschool apps on the phone for autism and stuff, like colors and shapes." Mother acknowledged that this was not an acceptable education for the Child. Mother further acknowledged that she used THC at the time of the Child's removal, but that her positive result for methamphetamine might have been caused by something that was "laced." Mother denied using methamphetamine with Justin C. at the time of the Child's removal, saying she was "clean." Asked about her own educational background, Mother said she did not finish high school. Mother asserted that the Child has developmental delays because of "the thing that's on his brain -- the tumor that's on his brain." Mother was then asked why she had objected to certain medication for the Child:

> Q. And in this case, at one point in time, the Department -- we had to file a motion and ask the Court to consider whether or not [the Child] needed to take certain medicine; is that correct?
> A. Yes, sir.
> Q. And is that because you refused to authorize --

-6-

A. It is.
Q. -- him to take that medicine?
A. It is.
Q. Is it your understanding that medicine was suggested and prescribed by a physician?
A. It is.
Q. Okay. Do you still believe, as we sit here today, that it's not in your son's interest to take medicine?
A. I wouldn't say that because it's not narcotics now. Like I said, the reason I didn't want him to take it is because at two years old, they had him on Xanax, Tenex, Risperdal. And narcotics for a little baby is not what I think -- or a kid -- that's, like, even young children nowadays that are on Adderall. I think that's not cool.

Continuing her testimony, Mother stated that, after she moved to Kentucky, the Child showed her using a stuffed animal how Father had sexually abused him. Mother stated that she called the police and filed a report, but nothing came of it. Returning to the subject of drug use, Mother said that the only drug she had used in front of the Child was marijuana.

On cross-examination, Mother stated that she works for one Wayne [A.] Mother said that she is now clean in terms of drug use. She continues to undergo therapy. On the day of trial, Mother was on Ambien, which helped her sleep. Mother was asked if she could help the Child overcome his intellectual disability. Mother replied: "I don't think he will ever overcome that. I mean, it's possible, but I don't think he would, and I hate to say that." On redirect, Mother stated that she had not divorced Justin C. yet because he could not be found. Regarding her work, Mother stated that she earns at least $600 per week, and once earned $1,300 in one week. Mother said that the window at her residence had been repaired. Asked on recross-examination about her health diagnoses from her providers, Mother testified that she has "severe" post-traumatic stress disorder ("PTSD").

Heather Tryon ("Tryon"), a program director for court-appointed special advocates, testified. Tryon stated that the Child had made gains since he entered DCS custody. The Child could communicate ideas and thoughts more clearly. With respect to Foster Parents, Tryon stated: "They both have experience with kids with special needs, and they have done a great job setting boundaries for him, working with him, helping him build the need -- the skills that he was lacking." Tryon visited Mother's current home in April 2021. Tryon stated:

Q. Who was living in the home?
A. [Mother] and [Michael B.], and then [Michael B.'s] four children.

Q. All right. And what was your impression of the home?
A. It's a mobile home, so it was -- it was small. It was cozy. We didn't spend a lot of time inside because at that point, the air-conditioning was out, and it was a warm day, and so we sat on the -- on the porch.

There was beds for everybody. The room that the girls' beds were in was on the -- the bed was on the floor because there had been some behavior issues. And I remember seeing a bag of garbage outside, but I don't remember the inside.
Q. All right. But the air conditioner was not functioning the day you made the visit?
A. That day, yes.
Q. I think I may have asked this, but part of your duties as a CASA volunteer is to provide a report to the Court and to provide a recommendation based on all of the information you know about the case; is that right?
A. Yes.
Q. And what is your recommendation at this time for this case?
A. I really spent a lot of time thinking about this case because there are a lot of positives and a lot of negatives. My recommendation at this point is because of [the Child] and who he is and his vulnerabilities, I think he needs to be in a family where there are clear boundaries and clear expectations, consistent discipline. I do think it would be in his best interest for him to be adopted by [Foster Parents].
Q. All right. And is it fair to say stability -- he needs stability?
A. Absolutely.

On cross-examination, Tryon was asked whether she had seen progress with Mother. Tryon answered: "When I first met [Mother], she was homeless; she was testing positive on her drug tests. At present, she has a home, and she has been testing negative for quite a while now." Tryon continued: "[I]n some ways I have seen a lot of progress. In some ways I still have concerns about her understanding of [the Child] and his needs…."

In January 2022, the Juvenile Court entered an order granting DCS's petition. In February 2022, the Juvenile Court entered an amended order to the same effect. In its amended order, the Juvenile Court found that the grounds of persistent conditions and severe child abuse were proven against Mother by the standard of clear and convincing evidence.[2] The Juvenile Court further found, also by clear and convincing evidence, that

---

[2] The Juvenile Court did not find that the grounds of substantial noncompliance with the permanency plans and failure to manifest an ability and willingness to assume custody were proven against Mother by clear and convincing evidence. In addition, because of an ambiguity in the Juvenile Court's order which we address herein, Mother and DCS disagree on whether the Juvenile Court ultimately found that the ground of abandonment by failure to provide a suitable home was proven against Mother, or dismissed.

termination of Mother's parental rights is in the Child's best interest. The Juvenile Court found, as relevant:

**GROUND III.**
**ABANDONMENT — FAILURE TO PROVIDE SUITABLE HOME**
**T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)**

14. The Court finds that there is clear and convincing evidence of abandonment by failure to provide a suitable home against [Mother]. In the requisite four month period after the child entered custody, DCS made reasonable efforts to assist the mother by creating a permanency plan and funding services to assist the mother. The mother initially lived in a hotel at the time of removal and subsequently lived out of her husband's truck for a period of time. Although [Mother] eventually obtained stable housing, she did not have suitable and appropriate housing for the child during the four month period after the custodial episode. As such, DCS proved by clear and convincing evidence that [Mother] abandoned the child by failure to provide a suitable home.

\*\*\*

**GROUND V.**
**PERSISTENT CONDITIONS**
**T.C.A. §§ 36-1-113(g)(3)**

26. The child has been removed from the home, legal custody and physical custody of [Mother] for a period of six (6) months by a court order at the initial stage of the underlying dependency and neglect proceedings in that [sic] gave rise to this cause. This order was based upon a petition which alleged that the child was dependent and neglected and was filed on October 29, 2019.

27. As of the first date setting this matter for hearing, it has been more than six months since this Court's order was entered that placed the child into DCS custody.

28. The Court finds that DCS removed the child from the home because of the mother's illegal drug use, lack of suitable housing, educational neglect, and lack of stability.

29. The Court finds that the conditions that led to the removal still persist and other conditions in the home exist that, in all reasonable probability, would lead to further neglect or abuse of the child.

30. The Court finds that it has no doubt that there have been some bad relationships in the parents' history. Further, the Court has no doubt that there are issues of severe PTSD in the parents' history. The Court further notes that it is a human reaction that, when you are scared and fearful, one will either fight or run. Further, when backed into a corner and one has nowhere to run, one is inclined to fight. The problem in this case is that there is a young child that was a part of this unstable world. The Court cannot find, by clear and convincing evidence, exactly what occurred in … Alabama. However, the Court does find that the home was not a good environment in which to raise a child.

The Court finds that the mother made the decision to leave Alabama and head to Hopkinsville, Kentucky. From there, she moved to Wilson County, Tennessee. She then entered a relationship with a man who was not good for either herself or her son. The Court finds that a parent has a duty to childproof a home for the child's safety. Thus, if there is something that is going to bring harm or a risk of harm to a child, you take appropriate measures to alleviate that risk. This also applies to individuals that you allow into your inner circle.

The Court finds that the mother tested positive for methamphetamine and for THC. She admits to using THC. As a result of the mother's drug use, the child tested positive for methamphetamine. The Court finds that the Court regularly hears excuses for why parents test positive for drugs that are not entirely factual. The Court finds that the mother tested positive for illegal drugs. She admitted to smoking marijuana. The Court finds that whether the child's positive hair follicle test was residual from [Mother] or was from the mother, the child was still exposed to drugs while in the mother's care. Further, as a result of being in the mother's care, the child tested positive for methamphetamine.

The Court finds that there are concerns for educational neglect in this matter. Specifically, the Court finds that the mother testified that she was not adequately prepared or trained to provide for the educational needs of this child. Further, she made the decision to use Google applications to try to teach the child. She admitted that she knew that this was an inadequate education for him. Thus, the child was a victim of educational neglect by the mother's own admission.

The Court finds that there have been issues with stability of housing. This has been an issue throughout the case. Further, the mother has lived a transient lifestyle, frequently moving from place to place. This has been proven by clear and convincing evidence.

The Court finds that the mother has made extraordinary strides in getting her life in order. It appears that the mother has finally found someone

who treats her well, with respect, with dignity and as a respectable human being. The Court also finds that the mother is engaged in individual counseling to address her PTSD and anxiety.

31. There is little chance that those conditions will be remedied soon so that the child can be returned safely to the home.

32. Continuation of the parent/child relationship greatly diminishes the child's chances of being placed into a safe, stable and permanent home.

33. DCS has proven, by clear and convincing evidence, the ground of persistent conditions against [Mother].

## GROUND VI.
## SEVERE CHILD ABUSE
## T.C.A. §§ 36-1-113(g)(4) and 37-1-102(b)(27)

34. [Mother] committed severe child abuse against the minor child. Specifically, the Court finds that, subsequent to the child's removal from the home, he tested positive on a hair follicle drug test for methamphetamine. This knowing exposure of the child to methamphetamine constitutes "severe child abuse" pursuant to Tenn. Code Ann. § 37-1-102(b)(27)(A).

35. The Court finds that the mother tested positive for methamphetamine and for THC. She admits to using THC. As a result of the mother's drug use, the child tested positive for methamphetamine. The Court finds that the Court regularly hears excuses for why parents test positive for drugs that are not entirely factual. The Court finds that the mother tested positive for illegal drugs. She admitted to smoking marijuana. The Court finds that whether the child's positive hair follicle test was residual from [Mother] or was from the mother, the child was still exposed to drugs while in the mother's care. Further, as a result of being in the mother's care, the child tested positive for methamphetamine.

36. DCS has proven, by clear and convincing evidence, the ground of "severe child abuse" against [Mother].

\*\*\*

## BEST INTEREST
## T.C.A. § 36-1-113(i)

40. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(1) is applicable in this matter. Thus, the Court finds that it is in the best interest of the minor child for termination to be granted as to the Respondents, because they have not made changes in their conduct or circumstances that would make it safe for the child to go home. Thus, the

Court finds that this factor weighs in favor of terminating the Respondents' parental rights.

41. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(2) is applicable in this matter. Thus, the Court finds that it is in the child's best interests for termination to be granted as to the Respondents, because they have not made lasting changes in their lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. Thus, the Court finds that this factor weighs in favor of terminating the Respondents' parental rights.

42. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(3) is applicable in this matter. Thus, the Court finds that it is in the child's best interests for termination to be granted as to [Father], because he has not engaged in regular visitation with the child. Thus, the Court finds that this factor weighs in favor of terminating the Respondent's parental rights.

43. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(4) is applicable in this matter. Specifically, the Court finds that the child has a relationship with both parents. … He also originally got upset when the mother was not in his life and was not in the picture. Thus, the Court finds that that child [has] a bond with the parents. [Mother] has demonstrated an ability or a desire to maintain that even if it is on a limited basis due to COVID. However, the Court also finds that the child has some unique and special issues. The Court commends DCS for locating a foster home with foster parents that are not only familiar with, but are also invested in, their professional careers of working with children who have special needs. The Court finds that this home is a good fit for the child, and the child is in a good home. This home has worked out well for the child. The foster parents understand that the child is on the autism spectrum, and they are experienced in recognizing and addressing these behaviors. They also recognize the importance of continuity and doing things consistently and doing things appropriately and getting in a routine. He is stable in this situation and is placed in a school that can provide for his needs. The Court finds that it is not in the child's best interest to do anything that would disrupt the child's life. The child has been stable and in his current home for two years. He has made progress verbally and educationally. He continues to make progress. It would be a disservice to this child to dramatically upend the child's world with an entirely new school and family.

The Court finds that the mother has a lot on her plate right now taking care of [Michael B.] and his children and working a job outside of the home. The Court is concerned that she would not be able to handle the additional stressors of caring for the child. The Court further finds that the mother has

a tendency to run when she encounters stress, and that would not be in the child's best interest. Thus, the Court finds that this factor weighs in favor of termination.

44. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(5) is applicable in this matter. Thus, the Court finds that it is in the child's best interests for termination to be granted as to the Respondents, because changing caregivers at this stage of the child's life would have a detrimental effect on him. The Court commends DCS for locating a foster home that is not only familiar with, but are also invested in, their professional careers of working with children who have special needs. The Court finds that this home is a good fit for the child, and the child is in a good home. This home has worked out well for the child. The foster parents understand that the child is on the autism spectrum, and they are experienced in recognizing and addressing these behaviors. They also recognize the importance of continuity and doing things consistently and doing things appropriately and getting in a routine. He is stable in this situation and is placed in a school that can provide for his needs. … Thus, the Court finds that this factor weighs in favor of terminating the Respondents' parental rights.

45. The Court finds that the best interest factor contained in … T.C.A. § 36-1-113(i)(6) is applicable in this matter. Thus, the Court finds that it is in the child's best interests for termination to be granted as to the Respondents, in that they have abused and neglected the child. The mother severely abused the child…. Thus, the Court finds that this factor weighs in favor of terminating the Respondents' parental rights.

46. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(7) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted as to the Respondents, because the physical environment of their home is not healthy and safe. … As to the mother, the Court is concerned that the child would be going from his current home where he is stable to a home that is small, with four other young people and two adults, and in a bedroom that is basically a partially converted living space. It also has a living room area which is a high-traffic area of a home. The Court anticipates that the home would likely be noisy. There would also be unknown dynamics of having other kids in the home, young people in the home, TVs going, video games going, and other similar factors. The Court finds that this social interaction would be a good thing, but it also creates, on a day-to-day basis, a lot of unpredictable noise and distractions in the child's life. Thus, the Court finds that this factor weighs in favor of terminating the Respondents' parental rights.

47. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(8) is applicable in this matter. Thus, the Court finds that [it is] in the child's best interests for termination to be granted as to the Respondents, because their mental and emotional state would be detrimental to the child and would prevent them from effectively parenting the child. The Court finds that the mother has unresolved dental care issues. She recognizes she could benefit from having different types of psychotropic medications and/or mood stabilizers. However, the court has question[s] about her follow-up and follow-through with services. Having a child with this level of needs would be an additional stressor in her life. Thus, the Court finds that this factor weighs in favor of terminating the Respondents' parental rights.

48. The Court finds that the best interest factor contained in T.C.A. § 36-1-113(i)(9) is applicable in this matter. Thus, the Court finds that it is in the child's best interest for termination to be granted, because the father has not paid child support consistent with the child support guidelines. Thus, the Court finds that factor weighs in favor of terminating the Respondents' parental rights.

49. DCS has proven, by clear and convincing evidence, that it is in the child's best interest for the parental rights of the Respondents to be terminated.

Mother timely appealed to this Court.

## **Discussion**

We restate and consolidate Mother's issues on appeal as follows: 1) whether the Juvenile Court erred in finding the ground of abandonment by failure to provide a suitable home; 2) whether the Juvenile Court erred in finding the ground of severe child abuse; 3) whether the Juvenile Court erred in finding the ground of persistent conditions; and 4) whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v.*

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without

-14-

*Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to

---

due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

-16-

and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of

correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

On November 3, 2020, when DCS filed its petition seeking to terminate Mother's parental rights to the Child, the grounds at issue were set out by statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

***

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;
(4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found

by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g) (West March 6, 2020 to April 21, 2021).

Abandonment by failure to provide a suitable home was defined by statute as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

***

(ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (West March 6, 2020 to June 30, 2021).

We first address whether the Juvenile Court erred in finding the ground of abandonment by failure to provide a suitable home. As a threshold matter on this issue, Mother argues that it is not clear that the Juvenile Court found this ground against her. In its factual findings quoted above, the Juvenile Court stated among other things that "DCS proved by clear and convincing evidence that [Mother] abandoned the child by failure to provide a suitable home." However, in its conclusions of law, the Juvenile Court held that "[p]ursuant to T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii), there is clear and convincing evidence that [Mother] has abandoned the child by failing to provide a suitable home for the child, such that this ground is dismissed." (Emphasis added). In its brief, DCS refers to this as a mere "typo." DCS argues further that Mother waived this argument by failing to cite authority in support of her position. Indeed, failure to cite authority in support of one's argument generally risks waiver of that argument. *Highland Physicians, Inc. v. Wellmont Health System*, 625 S.W.3d 262, 304 (Tenn. Ct. App. 2020). However, in this instance, the contradiction contained within the Juvenile Court's order is manifest, and Mother's failure to cite any authority in pointing out this contradiction is not fatal to her argument.

The Juvenile Court's statement, "such that this ground is dismissed," clashes with its earlier factual findings wherein in found that the ground was proven. While DCS states that the language about dismissal was just a typo, we cannot be so certain. For example, had the Juvenile Court included the word "not" as in "there is [not] clear and convincing evidence that [Mother] has abandoned the child by failing to provide a suitable home for the child, such that this ground is dismissed," the sentence would have a different meaning altogether. As our Supreme Court has stated: "[T]he court speaks through its order, not through the transcript." *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001) (citations omitted). Here, the Juvenile Court did not incorporate or attach its oral ruling from trial into its order. We are left with a contradiction. It also appears that no motion was filed by DCS to correct the alleged typographical error. In the appeal at bar, Mother's fundamental right to parent the Child is at issue. Mother argues persuasively that, given the stakes, the contradiction in the Juvenile Court's amended order should be resolved in her favor. We are unwilling to try to infer how the Juvenile Court intended to rule as to the ground of abandonment by failure to provide a suitable home. Therefore, in light of the ambiguity in the Juvenile Court's amended order, we find that the ground of abandonment by failure to provide a suitable home was not proven against Mother by clear and convincing evidence. We vacate the Juvenile Court's judgment as to this ground. We proceed to review the two grounds that unambiguously were found against Mother.

We next address whether the Juvenile Court erred in finding the ground of severe child abuse. On this issue, Mother argues that the hair follicle test result document underlying this ground was not properly authenticated. She says a chain of custody for the document was not established, nor was the document certified. Thus, Mother argues, the

document must be excluded from evidence. Mother further contends that none of the statutory definitions of severe child abuse apply to the situation herein and that the Child's age was not mentioned in the Juvenile Court's order in its findings on this issue. In response, DCS concedes that the hair follicle test result document itself was inadmissible. However, DCS points to testimony establishing the fact of the Child having tested positive for methamphetamine in December 2019 before he was eight years old, testimony to which Mother's counsel did not object. With respect to Mother's contention that her alleged conduct did not constitute severe child abuse under any statutory definition, DCS points to a relatively recent opinion by this Court in which severe child abuse was found under the following similar circumstances:

> The Juvenile Court found that both Isaiah and Izzabella were exposed to methamphetamine and that Izzabella's level of methamphetamine in her system was "off the charts." Based on their hair follicle drug screen results, it is clear that the children, Isaiah and Izzabella, were exposed to methamphetamine.
>
> Tennessee Code Annotated § 37-1-102(b)(27)(A)(i) provides that a parent commits severe child abuse when his or her actions result in "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death ...." This Court has consistently interpreted this subsection to include a parent's knowing exposure of a child to drugs or his or her failure to protect the child from such exposure. *See In re A.L.H.*, No. M2016-01574-COA-R3-JV, 2017 WL 3822901, at *5 (Tenn. Ct. App. Aug. 31, 2017) ("This Court has repeatedly held that exposure of a child to drugs constitutes severe child abuse."). Citing to subsection (A)(i), this Court has stated that "[c]lear and convincing evidence of severe child abuse is present when a child is exposed to methamphetamine." *In re Caydan T.*, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7, 2020).
>
> In 2019, the General Assembly added subsection (E), which provided an additional definition of severe child abuse. *See* Tenn. Pub. Acts, Ch. 510, § 4 (H.B. 509). Subsection (E) provides that a parent commits severe child abuse when he or she "[k]nowingly or with gross negligence" allows a child under the age of eight to ingest an illegal or controlled substance not legally prescribed to the child, which results in the child testing positive for the substance on a drug screen. Tenn. Code Ann. § 37-1-102(b)(27) (West July 1, 2019 to May 24, 2021).

***

-21-

> Although the Juvenile Court did not specify the specific definition to which it had relied, severe child abuse against Isaiah and Izzabella was proven as to both subsections (A) and (E). The evidence presented supports the Juvenile Court's finding by clear and convincing evidence that Mother committed severe abuse against Isaiah and Izzabella based on their exposure to methamphetamine in the family home as shown by, among other things, their subsequent drug test results being positive for methamphetamine.

*In re Kailey A.*, No. E2021-00801-COA-R3-PT, 2022 WL 773617, at *10 (Tenn. Ct. App. Mar. 14, 2022), *no appl. perm. appeal filed*. With regard to Mother's argument that the Juvenile Court failed to determine the Child's age at the time he allegedly was severely abused, DCS notes that the record clearly establishes the Child's birthdate in January of 2012; thus, there is no uncertainty over the Child's age.

Mother timely objected to the introduction of the hair follicle test result document, and DCS concedes its inadmissibility on appeal. Nevertheless, that the Child tested positive for methamphetamine is established elsewhere in the record. Namely, Hodge and Foster Mother both testified to the Child having tested positive for methamphetamine. Mother's attorney questioned Foster Mother about the test. This line of questioning went without objection. Therefore, despite the inadmissibility of the hair follicle test result document itself, the fact of the Child's having tested positive for methamphetamine in December 2019 is otherwise grounded in admissible evidence. Regarding whether Mother's conduct arose to severe child abuse, we disagree with Mother that the Juvenile Court failed to make sufficient findings that her conduct constituted severe child abuse pursuant to statute. As we articulated in *In re Kailey A.*, even when a trial court fails to specifically identify which definition of severe child abuse it relied upon, evidence of a child's exposure to methamphetamine in a parent's care can serve as a basis for proving the ground of severe child abuse by the requisite clear and convincing evidence. Here, the evidence shows that Mother tested positive for methamphetamine upon the Child's removal, although she said she was clean. She undisputedly lived with a man who used methamphetamine. That the Child's exposure to methamphetamine occurred as a result of his living in an environment in which methamphetamine was being used, while in Mother's care, is a logical conclusion reached by the Juvenile Court based upon the evidence and is sufficient to sustain this ground. Finally, Mother's argument concerning any uncertainty over the Child's age is without merit as the Child's date of birth is clearly established in the record. We find, as did the Juvenile Court, that the ground of severe child abuse was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of persistent conditions. As relevant to this ground, Mother concedes that the requisite six months have

passed. However, she asserts that the other elements of this ground were not met, to wit: as relevant to subsection (i) of this ground, that DCS did not remove all of Michael B.'s children from his custody despite visiting his home multiple times, which Mother says shows there is no reasonable probability of abuse or neglect in her home; that Mother tested negative for illegal drugs by January 2020 and has continued to do so ever since; that Mother's housing issue was resolved within six months from the start of the case and she has lived in stability with [Michael B.] since; and that Mother was never given an opportunity to rectify the Child's educational neglect. With respect to subsection (ii), Mother argues that all of the original harmful conditions necessitating the Child's removal were rectified within the first six months of the case. With respect to subsection (iii), Mother argues that preserving her parental rights is consistent with the Child continuing to integrate into Foster Parents' home. Mother also contends that DCS has "unclean hands" in that it failed to assist Mother in obtaining suitable housing. Mother questions DCS's "good faith" on this ground. For its part, DCS points out that Mother cited no authority for applying the unclean hands doctrine in this context. DCS further states that reasonable concerns about Mother's ability to care for the Child existed at the beginning of the case and have persisted throughout.

Mother is correct in that the record shows she made certain significant strides over the course of this case. The Juvenile Court credited Mother for these strides when addressing the ground of persistent conditions. For some two years, Mother did not have any more positive drug screens. She also has lived at the same residence for an extended period of time. She is undergoing counseling for her PTSD. These strides are commendable on Mother's part. However, other problems remain. The Juvenile Court found that Mother has engaged in educational neglect toward the Child and has lacked stability in her life. The Juvenile Court noted Mother's testimony to the effect that "she was not adequately prepared or trained to provide for the educational needs of this child." When Mother had custody of the Child, she declined to enroll him at school in Tennessee or Kentucky. Mother offered the excuse that she was afraid of Father taking the Child from her again. Whatever the excuse, this was unacceptable by Mother. Mother was not qualified to homeschool the Child; she simply kept him out of school and thus contributed to his neglect. The Juvenile Court found that there are "concerns for educational neglect in this matter." We agree. When the Child first entered foster care, he could not recognize letters or numbers. Against this background, Mother at trial repeatedly emphasized the Child's love of and knowledge about colors, as well as his preference for color-based apps while he was being 'homeschooled.' Respectfully, Mother's testimony reflected a total lack of appreciation of the gravity of the Child's special educational and medical needs. Meanwhile, the evidence shows that the Child is receiving the care he needs in Foster Parents' home. There is no hint in this record that Mother has the wherewithal or inclination to attend to the Child's special needs, be they educational or medical. We also

-23-

find no applicability of the doctrine of unclean hands in this context; Mother presented no authority on this subject.

The elements of the ground of persistent conditions have been established. The Child was removed by court order from Mother's custody for a period longer than six months; Mother's inability to care for the Child persists, and would in all reasonable likelihood lead to the Child being subjected to further abuse and neglect; there is little likelihood these conditions will be remedied at an early date so as to permit the Child to be safely returned to Mother; and the continuation of Mother's and the Child's relationship serves only to keep the Child in limbo and thereby greatly diminish his chance of early integration into a safe, stable, and permanent home. The evidence does not preponderate against the Juvenile Court's factual findings relative to this or any other ground as found by the Juvenile Court. We find, as did the Juvenile Court, that the ground of persistent conditions was proven against Mother by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Child's best interest. When DCS filed its termination petition, the statutory best interest factors read as follows:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance

-24-

analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (West March 6, 2020 to April 21, 2021).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each

statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Mother makes several arguments as to why she believes the Juvenile Court erred in its best interest analysis. Mother argues that she has successfully adjusted her conditions and made lasting changes as evidenced by her two-year relationship with [Michael B.]; that Hodge failed to volunteer to do anything to help Mother with her housing situation; that Mother has tested negative for methamphetamine for two years; that aside from an earlier air conditioning issue, there is no problem with Mother's current home; that Mother has regularly visited the Child; and that a bond exists between Mother and the Child. DCS, in turn, argues that "Mother still did not comprehend the enormity of [the Child's] special needs and his educational level, or how to properly manage his disabilities and medical needs." DCS concedes that Mother and the Child have a relationship.

Initially, we observe that the Juvenile Court invoked best interest factors (3) and (9)—concerning visitation and child support, respectively—in regard to Father specifically without stating how either factor supported termination of Mother's parental rights. The record reflects that Mother regularly visited the Child, and that she paid at least some child support. We find that neither factors (3) nor (9) support termination of Mother's parental rights.

Nevertheless, while Mother indisputably made strides in some key areas, she unfortunately did not rectify all of the issues that prevent her from safely parenting or resuming custody of the Child. Mother's record of residential stability, while recently good, has been tenuous. She is living at her sixth residence over the course of the case. Beyond this, the most serious problem remains Mother's persisting inability to appreciate the Child's special educational and medical needs. The Child is autistic, and suffers from

an intellectual disability. He requires special care and is receiving that care from Foster Parents. While Mother says she was never given an opportunity to rectify the Child's educational neglect, the fact remains that she contributed to his educational neglect in the first place and has failed to show that she can or will sufficiently address the Child's special educational needs moving forward. In Foster Parents' home, there is no such lack of clarity—they currently attend to the Child's needs. In addition, Mother unreasonably objected to the Child receiving certain recommended medical care. For instance, Mother's testimony at trial that she refused to authorize physician-recommended medication for the Child because certain medication is "not cool" for children once again reflects her total lack of appreciation for the gravity of the Child's needs. In sum, Mother evinced little grasp of the Child's special educational or medical needs. The evidence does not preponderate against the Juvenile Court's factual findings relative to this issue. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Child's best interest.

## Conclusion

The judgment of the Juvenile Court terminating Mother's parental rights to the Child is affirmed as modified. This cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Christina C., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE